**NIGHT BOX**
**FILED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA ⟋ NOV 1 9 2001

CASE NO. 00-6309-CR-SEITZ

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,           :
                                    :
    Plaintiff,                      :
                                    :
v.                                  :
                                    :
JOSEPH RUSSO AND                    :
DOREEN RUSSO, et al.                :
                                    :
    Defendants.                     :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## JOINT MOTION BY JOSEPH RUSSO AND
## DOREEN RUSSO TO SUPPRESS FRUITS OF WIRETAPS

Defendants JOSEPH RUSSO and DOREEN RUSSO, through undersigned counsel

and pursuant to the Fourth Amendment to the United States Constitution and 18 U.S.C.

§ 2518, move this Court to suppress all communications intercepted pursuant to two orders

of interception for telephone lines (954) 614-1821 and (954) 557-3651. The Honorable

William P. Dimitrouleas ordered the first 30-day wiretap on January 7, 2000, and an

extension on February 11, 2000.[1]  Suppression is required because the government's

interception application and the supporting affidavit of Agent Patrick G. Brodsky failed to

recite "a full and complete statement as to whether or not other investigative procedures

have been tried and failed or why they reasonably appear to be unlikely to succeed if tried

or to be too dangerous," as required by 18 U.S.C. § 2518(1)(c). This is commonly known

---

[1]  The supporting affidavits are attached as Exhibit A and B respectfully of Joint
Appendix in Support of Joint Motion by Joseph Russo and Doreen Russo to Suppress
Fruits of Wiretaps.

-1-

as the "necessity" requirement.  Accordingly, all intercepted communications, as well as all evidence derived from those interceptions, must be suppressed.  Wong Sun v. United States, 371 U.S. 471 (1963);  United States v. Giordano, 416 U.S. 505, 527 (1974).  To the extent that the applications were deliberately inaccurate or misleading, suppression is likewise warranted.  See Franks v. Delaware, 438 U.S. 154 (1978).

## STANDING

Joseph and Doreen Russo are "aggrieved persons" as defined by 18 U.S.C. § 2510(11) because they each were "a party to intercepted oral communications."  The couple has standing to move to suppress the fruits of the government's interceptions.

## NECESSITY REQUIREMENT

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."  Berger v. New York, 388 U.S. 41, 63 (1967).  Heeding this warning, Congress enacted Title III of the Omnibus Control and Safe Streets Act of 1968, which strictly limits the government's right to intercept and disclose oral communications.  Codified at 18 U.S.C. § 2510 et seq., the Act provides that all applications to intercept telephone conversations must include "a *full and complete statement* as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) (emphasis added); see also United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987) ("the sovereign should make a reasonable, good faith effort to run the gamut of normal

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131● (305) 371-6421

investigative procedures before resorting to means so intrusive as electronic interception of telephone calls").

Suppression is required when the government fails to comply with any statutory mandate that "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."    Giordano, 416 U.S. at 527.   "Generally, the government must overcome the statutory presumption against granting a wiretap application by showing necessity." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1995).  The statutory presumption ensures that wiretapping is not used as a matter of course in every criminal investigation simply because the government believes that it is easy and effective.  Indeed, the Fourth Circuit has expressly recognized that "[s]ections 2518(1)(c) and (3)(c) are designed to ensure that the relatively intrusive device of wiretapping is neither routinely employed as the initial step in criminal investigation, nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting Giordano, 416 U.S. at 515; United States v. Kahn, 415 U.S. 143, 153, n. 12 (1974)).

In this case, Agent Brodsky indicated  in his January 7, 2000, affidavit that wiretaps are necessary "because alternative investigative techniques to further this investigation (a) have been tried with only *limited success* and appear reasonably *unlikely to reach greater success* if continued, or, (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried . . . ." See Brodsky Affidavit of January 7, 2000, ¶ 93 (emphasis added). Before addressing its substance, Agent Brodsky's assertion must be placed in the proper

context.

The government began investigating Mamone, Raffa and their "associates" prior to 1998. By January 7, 2000, the government expended great resources, resulting in a well-developed collection of RICO evidence.  In light of that evidence, one could have even challenged the necessity of the government's request on September 23, 1999, for a wiretap targeting Raffa, Mamone and Morgenstern.[2]  At that time, the government had at least five (5) effective confidential sources and two (2) cooperating witnesses.  See Brodsky Affidavit of September 23, 1999, ¶¶ 24-72.  Those sources gathered information, joined in criminal acts, overheard admissions, recorded conversations, and were allegedly victimized by Raffa and Mamone.  Id.  The government also established physical surveillance and collected extensive data regarding patterns of telephonic contact, which identified associations.  Id. at ¶¶ 73-87 and 93.[3]

Even before the September 23, 1999, wiretap, the government obtained other wiretaps. On October 16, 1998, the government obtained a wiretap targeting Mamone and others, which was extended on November 16, 1998.  Id. at ¶ 20.  On November 12, 1999, the government obtained a separate wiretap targeting Mamone and others, which was extended on December 28, 1999, and again on February 4, 2000.  See Brodsky Affidavit

_____

[2] This wiretap request was granted by Judge William P. Dimitrouleas.  The affidavit supporting the government's application is attached as Exhibit C of Joint Appendix in Support of Joint Motion by Joseph Russo and Doreen Russo to Suppress Fruits of Wiretaps.

[3] The government may have gathered more proof by September 23, 1999.  On November 1, 2001, the Russos filed a Joint Motion for Production of Wiretap Applications. As of the filing of this motion to suppress, the government has not provided in discovery each of the affidavits from wiretaps targeting Mamone, Raffa, Morgenstern and others. Without them, the history of the investigation may be incomplete.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131• (305) 371-6421

of February 11, 2000, ¶¶ 41-48. In sum, the government has not wanted for a chance to listen in on Raffa, Mamone and a variety of their "associates."[4]

Notwithstanding an investigation reaching full maturity, in his January 7, 2000, affidavit, Agent Brodsky claimed that another wiretap was necessary. He reasoned not that normal investigative techniques had *failed*. Instead, they were merely *not successful enough*. See Brodsky Affidavit of January 7, 2000, ¶ 93. His own words seem to suggest that his wiretap request fell below the legal standard.[5] To that extent, Agent Brodsky was correct. He was incorrect, however, in concluding that a wiretap was necessary. It was not. The bottom line is that the investigative techniques which had been tried had *not* failed, and techniques which had not been tried did *not* reasonably appear to be unlikely to succeed.

First, Agent Brodsky's affidavits of September 23, 1999, January 7, 2000, and February 11, 2000, are replete with details of how the use of confidential sources, a normal investigative technique, was consistently producing tangible results. CS-1 "has been associated with members of all five of the New York LCN and the Trafficante LCN family for over 15 years." See Brodsky Affidavit of January 7, 2000, ¶ 33. CS-1 learned that Raffa and Mamone traffic narcotics and make extortionate loans. Id. at ¶¶ 34-35. CS-2 maintained a 20-year association with a New York LCN family and has known Raffa since

---

[4] Thus, it is fair to say that on January 7, 2000, the government did not desire *a wiretap*. It desired *more wiretaps*.

[5] The legal test stresses the failure of normal investigative techniques. All applications to intercept telephone conversations must include "a full and complete statement as to whether or not other investigative procedures have been tried and *failed* or why they reasonably appear to be *unlikely to succeed* if tried or be too dangerous." 18 U.S.C. § 2518(1)(c) (emphasis added).

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131● (305) 371-6421

1990. Raffa admitted his membership in the Trafficante LCN family to CS-2 and explained the group's organization and operation. CS-2 advised that Mamone and Raffa engage in illegal gambling. Id. at ¶¶ 36-37. CS-3 has known Mamone for 5 years. He obtained a $40,000 extortionate loan from Mamone and Joseph Russo in 1995 and in 1997 the two assaulted CS-3 and another in connection with a debt. Id. at ¶¶ 38-40.

As debtor and collector of Mamone's loans, CS-4 learned of and recorded conversations about gambling operations, stolen property, loansharking and money laundering. Id. at ¶¶ 42-58. On Mamone's behalf, CS-4 collected gambling debts and attempted to cash a counterfeit check, as well as 21 checks from Morgenstern. Id. CS-4 is aware that Morgenstern's business, Gold Coast Check Cashing, is used by Mamone to further his criminal activities. See Brodsky Affidavit of September 23, 1999, ¶ 40. CS-5 worked for the Womacks, who allegedly managed an investment fraud operation in South Carolina and Georgia. CS-5 discovered that Morgenstern cashed checks derived from the investment fraud scheme. See Brodsky Affidavit of January 7, 2000, ¶ 71. A separate confidential source gave information and recorded conversations regarding a usurious loan obtained through Raffa's Cash '96 Corporation in 1999. See Brodsky Affidavit of September 23, 1999, ¶¶ 54-71.

Despite the network of confidential sources, Agent Brodsky concluded that "they are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify." See Brodsky Affidavit of January 7, 2000, ¶ 97. Brodsky's former

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131• (305) 371-6421

contention is an overstatement. In comprehensive fashion, the confidential sources can substantiate a RICO case. His latter claim--that his confidential informants are scared to testify--is insufficient to justify the interceptions authorized in this case.

The consensus in this and other judicial contexts is that fear for personal safety or the safety of others "would not provide a legal basis for a refusal to testify." In re Grand Jury Proceedings, 922 F.2d 1266, 1272 (6th Cir. 1991) (citing Piemonte v. United States, 361 U.S. 556, 559 n.2 (1961)); see also Roberts v. United States, 445 U.S. 552 (1980) (a defendant who receives immunity from prosecution is obliged, like all other citizens, to assist the authorities in the investigation of crime). If witnesses were permitted to withhold testimony because of a generalized, undefined fear of retaliation, then "any person involved in a criminal enterprise could point to the possible danger that comes from giving testimony[,]" In Re Grand Jury Proceedings, 914 F.2d 1372, 1375 (9th Cir. 1990), and refuse to testify.

"[F]ear for personal and family safety is not a defense to a charge arising from refusal of a witness to testify." In Re Grand Jury Proceedings, 605 F.2d 750, 752 (5th Cir. 1979). Indeed,

> [n]o federal court in a reported decision has held that fear of retaliation is sufficient reason to refuse to testify. To do so in this case would mean that virtually every prisoner in the United States, and millions of people at large, would be freed of *the duty to appear and testify* before a grand jury.

Dupuy v. United States, 518 F.2d 1295 (9th Cir. 1975) (emphasis added). Thus, Agent Brodsky's suggestion that confidential sources would be unwilling to testify at any proceeding for fear of their safety is insufficient to justify a wiretap.

-7-

Second, the government had relationships with valuable cooperating witnesses. For example, Agent Brodsky's affidavit of September 23, 1999, states that Louise Mainone, an associate of the Gambino Crime Family, cooperated by recording meetings regarding Raffa, Mamone and their activity as members of the Trafficante family. See Brodsky Affidavit of September 23, 1999, ¶¶ 31-34. Salvatore Leonardi is an associate of a Sicilian Mafia organization, who has provided information and recorded conversations for the FBI. Id. at ¶¶ 41-53. Having worked for Raffa, Leonardi has first-hand knowledge of Raffa's loansharking, money laundering and gambling operations. Id.

In late January 2000, the government secured Crystal Wilkinson's cooperation. She worked for the Womacks and can explain the financial relationship between the Womack's investment fraud operation and Morgenstern. See Brodsky Affidavit of February 11, 2000, ¶ 100. Although her cooperation began after the January 7, 2000, intercept order, it illustrates the ubiquitous possibility of obtaining helpful cooperating witnesses in federal cases. Agent Brodsky in his affidavit of January 7, 2000, did not address this point. Given the present state of our sentencing laws, it seems disingenuous to ignore that co-conspirators would likely cooperate.

Third, the government possessed revealing bank records. Agent Brodsky's affidavit of January 7, 2000, explained that "many bank records have been subpoenaed and reviewed in relationship to the investment fraud portion of this investigation . . . ." See Brodsky Affidavit of January 7, 2000, ¶ 105. These have disclosed where fraudulently obtained funds were channeled. Id. Also, the records are particularly telling when viewed in conjunction with the travel by Morgenstern and Womack to the Bahamas. Id. at ¶ 79.

Fourth, the government utilized multiple pen register and tap and trace techniques along with telephone records to successfully advance its investigation. They revealed "the associations and frequency of contact of the known participants with each other." Id. at ¶ 104. In other words, as to Raffa, Mamone, Morgenstern, Gold Coast Checking and the Womacks, the government largely determined who called whom, from where, when, and for how long. Id. at ¶ 79-92. This information is critical in a RICO conspiracy case. Upon review, Agent Brodsky drew the conclusion that the contacts "are in furtherance of criminal activities of the conspiracy." Id. at ¶ 79.

Fifth, in seeking the intercept orders, the government admitted that "[s]urveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants." Id. at ¶ 98. The government dismissed the value of surveillance, however, stating "in and of itself this technique does not disclose the substance of the criminal conversations." Id. at ¶ 99. This Court should disregard Agent Brodsky's fallacy:  since physical surveillance did not accomplish what it could never, then it failed.

Sixth, the government also undervalued search warrants.  To establish necessity for wiretaps, "the government cannot discharge its burden with 'bare conclusory statements that normal techniques would be unproductive . . .' or with 'mere boilerplate recitation of the difficulties of gathering usable evidence.'" Smith, 31 F.3d at 1297; see also United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983) ("[l]ike other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful"). In keeping with the requirements of the Fourth Amendment, the government must allege

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131● (305) 371-6421

"specific factual information . . . that it has encountered difficulties in penetrating [the] criminal enterprise." Smith, 31 F.3d at 1298.

A judicial finding that a wiretap is "necessary" must be particular to the specific application under consideration.  This means that every *application*, and not simply an investigation in generic terms (i.e., "a gambling investigation"), must establish need. "*Each* wiretap application, standing alone, must satisfy the necessity requirement." United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir. 1988) (emphasis in original).

For instance, in United States v. Kalustian, 529 F.2d 585 (9th Cir. 1976), the Ninth Circuit held that generalizations in a wiretap affidavit based on "knowledge and experience" gained in other gambling cases was insufficient to establish need in that particular investigation.  Addressing the investigative value of a search warrant, the FBI agent in Kalustian claimed that his

> experience, and the experience of other Agents, has shown that gambling raids and searches of gamblers and gambling establishments have not, *in the past*, resulted in the gathering of physical or other evidence to prove all elements of the offense. I have found through my experience and the experience of other Special Agents who have worked on gambling cases, that gamblers *frequently* do not keep permanent records.

Id. at 588 (emphasis added).  Essentially, "the Government's position [was] that all gambling conspiracies are tough to crack, so the government need show only the probability that illegal gambling is afoot to justify electronic surveillance." Id. at 590.  The court rejected the government's position and reversed the trial court's order denying the defendant's motion to suppress. Id.  The wiretap application, the court wrote, "did not show why traditional investigative techniques were not sufficient *in this particular case*." Id. (emphasis added).  A judge reviewing a wiretap application under these circumstances

is "handicapped without such a showing." Id.

Like the FBI Agent in Kalustian, Agent Brodsky in this case rejected the value of search warrants, a normal investigative technique:

> [b]ased upon my experience . . . it is my *belief* that the use of search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all the co-conspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in coded format, which is difficult to decipher absent the interception of relevant communications.

Id. at ¶ 106 (emphasis added). This was not the whole truth. On January 7, 2000, *the same day that the government presented Agent Brodsky's affidavit*, the government executed search warrants at the Womacks' residence, offices in South Carolina, Arizona, as well as Morgenstern's Merrit Advisors Group and Gold Coast Check Cashing in Margate, Florida. Id. The searches produced documents and records of "evidentiary value." See Brodsky Affidavit of February 11, 2000, ¶ 105. To the extent that Agent Brodsky's affidavit was deliberately inaccurate or misleading, suppression is warranted. See Franks v. Delaware, 438 U.S. 154 (1978).

Even if they had not been productive, the government articulated no specific reason to believe, one way or the other, whether the search would be fruitful. See Brodsky Affidavit of January 7, 2000, ¶ 106. Agent Brodsky's opinion that the search would not be productive is unsupported by facts. The judge reviewing this affidavit had no option but to accept Agent Brodsky's words at face value. There is nothing to indicate what happened in prior investigations, how that may be relevant to this investigation, or why the government believed that the same thing would happen here.

Seventh, in considering the possibility that undercover agents could infiltrate the

"criminal group" under investigation, Agent Brodsky, in similar fashion, stated that

> [t]he FBI in 1994 attempted to introduce two undercover agents into the RAFFA criminal organization. These efforts proved to be unsuccessful, and RAFFA later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

Id. at ¶ 95. Yet, judging by the extensive use of confidential sources in this investigation, the criminal group under investigation was indeed penetrable. According to the government, this case involves gambling operations and loansharking. These operations cannot function without bettors and debtors. Agent Brodsky or any other FBI agent could have "infiltrated" the businesses by posing as an enthusiastic sports bettor or someone looking for a loan. Apparently, this normal investigative technique was never attempted.

Finally, the allegation that undercover agents, confidential sources or cooperating witnesses could not "satisfy all the goals" of the government's investigation is a red herring. See Brodsky Affidavit of January 7, 2000, ¶ 95. Under that standard, a wiretap is always necessary. The law does not recognize that as a basis for dispensing with traditional investigative techniques in favor of the intrusive wiretap. To the contrary, wiretaps are supposed to be a measure of last resort.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BLVD, SUITE 1300, MIAMI, FL 33131● (305) 371-6421

## CONCLUSION

On January 7, 2000, when the government requested the extraordinary aid of a wiretap, its investigation of the Trafficante organization was in full bloom. The government had already listened in on Raffa, Mamone, Morgenstern and other associated targets with at least six (6) prior wiretaps. The government had also exploited a multiplicity of traditional investigative techniques. It had approximately five (5) confidential sources, cooperating witnesses, physical surveillance, body wire recordings, telephone data, search warrants and bank records. The productivity of the traditional investigation was such that even Agent Brodsky could not state under oath that normal techniques had *failed*.

The fact is that normal techniques succeeded for the government. This success could have continued without resort to another wiretap, but the government preferred to take to take the easier road. To justify its actions and requests, the government dismissed the value of many techniques not because they had been tried in this case and had failed, or were reasonably likely to fail in this case, but because they supposedly had been tried in other undisclosed cases, in undisclosed ways, and had failed in undisclosed manners. More is required before big brother is permitted to tap into our telephone lines and listen to our conversations. Accordingly, the fruits of all wiretaps in this case must be suppressed, including communications intercepted during the initial 30-day interception, those intercepted during the subsequent extension, and all derivative evidence. 18 U.S.C. §2515 & 2518(10)(a); Giordano, 416 U.S. at 533 ("in our view, the results of the conversations overheard under the initial order were essential, both in fact and in law, to any extension of the intercept authority"); Wong Sun v. United States, 371 U.S. 471 (1963).

To the extent that the applications were deliberately inaccurate or misleading, suppression is likewise warranted.    See Franks v. Delaware, 438 U.S. 154 (1978).

Respectfully submitted,

**BLACK, SREBNICK & KORNSPAN, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421; Fax: (305) 358-2006

By:

HOWARD M. SREBNICK, ESQ
Florida Bar Number 919063
Attorney for Doreen Russo

-14-

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on _____ 11/19 _____, 2001 a true and correct copy of the

foregoing was furnished by mail to:

Brian McCormick, Esq. *( by overnight*
Assistant United States Attorney *mail )*
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Jayne Weintraub, Esq.
100 S.E. 2nd Street, Suite 3550
Miami, Florida 33131

John Howes, Esq.
633 S.E. 3rd Avenue, Suite 4F
Ft. Lauderdale, FL 33302

Ana M. Jones, Esq.
Bayside Plaza, Suite 625
330 Biscayne Boulevard
Miami, Florida 33132

Emmanuel Perez, Esq.
2121 Ponce de Leon Boulevard
Suite 290
Coral Gables, FL 33134-5222

Brian L. Tannebaum, Esq.
First Union Financial Center
200 South Biscayne Blvd., Suite 2690
Miami, Florida 33131

Jeffrey M. Harris, Esq.
One East Broward Boulevard, Suite 1500
Ft. Lauderdale, Florida 33301

Kenneth M. Swartz, Esq.
100 N. Biscayne Boulevard
21st Floor, New World Tower
Miami, Florida 33132

Philip R. Horowitz, Esq.
12651 S. Dixie Highway
Suite 328
Miami, Florida 33156

James Benjamin, Esq.
One Financial Plaza, Suite 1615
Ft. Lauderdale, FL 33394

Joseph S. Rosenbaum, Esq.
2400 South Dixie Highway
Suite 105
Miami, Florida 33133

David Tarlow, Esq.
801 Brickell Avenue, Suite 1901
Miami, Florida 33131-2900

Jon May, Esq.
200 East Broward Boulevard, Suite 1200
Ft. Lauderdale, FL 33301

David Rothman, Esq.
First Union Financial Center
200 South Biscayne Blvd., Suite 2690
Miami, Florida 33131

By: _[signature]_
**HOWARD M. SREBNICK, ESQ.**
Attorney for Doreen Russo

-15-