UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,  :  CASE NO. 00-6309-CR-SEITZ
   :
   Plaintiff,  :
   :
v.  :
   :
DOREEN RUSSO, et al.  :
   :
   Defendant.  :
............................  :

*NIGHT BOX FILED*

*[stamp] 2001*
*CLARENCE MADDOX*
*CLERK, USDC / SDFL / MIA*

**DOREEN RUSSO'S MOTION TO SEVER HER TRIAL FROM
THE TRIAL OF HER CO-DEFENDANT JOSEPH RUSSO**

Defendant DOREEN RUSSO, by and through counsel, and pursuant to Federal Rule of Criminal Procedure 14, the Due Process Clause of the Fifth Amendment, the Compulsory Process Clause of the Sixth Amendment, and *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970), respectfully moves this Honorable Court to sever her trial from the trial of her husband, co-defendant JOSEPH RUSSO. In support of this motion, defendant Doreen Russo states:

### INTRODUCTION

Doreen Russo, Joseph Russo and others are charged in Count 14 of the Second Superseding Indictment with conspiracy to commit money laundering. Counts 50-53 charge Doreen Russo, Joseph Russo and others with money laundering. Joseph Russo is charged in Count 1 with entering into a RICO conspiracy with other co-defendants. Doreen Russo is presumed innocent and has maintained her innocence to these charges since day one. She has an absolute right under the United States Constitution to present

evidence of her innocence to the jury who will decide her fate.

In the present posture of this case, however, Doreen Russo will be deprived of that right because the single most critical witness to proving her innocence is a co-defendant-- her husband, Joseph Russo. At a joint trial, Joseph Russo will exercise his right not to testify, and a substantial danger exists that the jury might convict Doreen Russo without hearing his exculpatory testimony. As the Proffer of Counsel[1] and his post-arrest statement suggest,[2] Joseph Russo's testimony would show that Doreen Russo was unfamiliar with his business affairs, and that she did not have knowledge about the nature of the transactions she made or the source of the funds. Although she was officially associated at one time with Check Cashing Unlimited, it was apparently in name only.

This motion seeks to ensure that any jury deciding the fate of Doreen Russo hears this totally exculpatory testimony, by severing her trial from the trial of her husband Joseph Russo. At a severed trial, Joseph Russo will testify and rebut the inference that since Doreen Russo was a named member of the corporation, she knew about the transactions and the source of the funds. The jury will know through Joseph Russo's testimony that Doreen Russo had no knowledge of the nature of the transactions she made or the source of the funds involved. Absent the testimony of her husband Joseph Russo, the jury may believe that she was aware of the nature of his business affairs, as well as familiar with the

---

[1] It is the understanding of undersigned counsel that a Proffer of Counsel will be filed by Joseph Russo's attorneys, which details his testimony as it relates to Doreen Russo.

[2] As noted by Special Agent Ronald E. Wise in his August 27, 2001, IRS Memorandum of Activity, Joseph Russo stated to federal agents that "she knows nothing about money, and that she wrote checks because he told her to do so." *See* Exhibit A at page 3.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

purposes of the transactions and the source of the funds. **She was not and the jury must be informed.** On that basis, she seeks a severance.

## MEMORANDUM OF LAW

The Fifth and Sixth Amendments to the United States Constitution guarantee to a criminal defendant the right to due process of law, the right to a fair trial, and the right to compulsory process to obtain the testimony of defense witnesses. To assure that these constitutional guarantees are fulfilled in cases where the defendant seeks the exculpatory testimony of a co-defendant, the Eleventh Circuit and its predecessor, the former Fifth Circuit, have set out in detail the analysis for a trial court to follow.

The analysis starts with the general principle that the right to present relevant evidence is "a fundamental element of due process of law." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). The essential right secured to a criminal defendant by the due process clause is "the right to a fair opportunity to defend against the [prosecution's] accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also United States v. Cohen*, 888 F.2d 770, 777 (11th Cir. 1989) ("The trial court's discretion does not extend to exclusion of crucial relevant evidence."). Of all the ways that the accused might defend against such accusations, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. at 302. In both *Chambers* and *Taylor*, the court found it to be a fundamental breach of due process and of the right to a fair trial for the trial court to preclude the defendant, based on procedural or evidentiary rules, from calling his witnesses to the stand.

The primary constitutional guarantor of the criminal defendant's right to secure the

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

attendance of his or her witnesses at trial is the Sixth Amendment right of compulsory process. See *Washington v. Texas*, 388 U.S. 14 (1967). As the court observed in *Washington v. Texas*:

> [t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19; see also *United States v. Nixon*, 418 U.S. 683, 709 (1974) ("To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."). In *Washington*, the court struck down a state law that prevented the defendant from calling a witness, who was otherwise willing to appear and to testify, simply because that witness also had been charged in the same crime.

To ensure that joinder of defendants under Federal Rule of Criminal Procedure 8(b) does not categorically prevent defendants from presenting relevant exculpatory testimony, this Circuit has fashioned an analysis to be used to determine if the defendant seeking testimony from a co-defendant is entitled to a severance under Federal Rule of Criminal Procedure 14. The analysis provides:

> [i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.[3]

---

[3] Rule 14 is to "be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed. R. Crim. P 2.

4

That analysis is set out in *Byrd v. Wainwright* and its progeny, and it is to that line of cases that we now turn.

## Byrd And Its Progeny

In the seminal case on this issue, *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970), the former Fifth Circuit addressed the defendant's right to a severance when a co-defendant possesses exculpatory testimony. In *Byrd*, a defendant in a state court rape case had sought a severance from his co-defendants in order to adduce their testimony that he had not been involved in the rape. *Id.* at 1018. The state court denied this motion, and the defendant was convicted. *Id.* Judge Atkins of this Court granted the defendant's habeas corpus petition, finding that the denial of the severance motion violated due process. *Id.* The Fifth Circuit affirmed and identified five broad areas for trial courts to consider when passing on such motions for severance:

> (1) Does the movant intend or desire to have the codefendant testify? How must his intent be made known to the court, and to what extent must the court be satisfied that it is bona fide?
>
> (2) Will the projected testimony of the codefendant be exculpatory in nature, and how significant must the effect be? How does the defendant show the nature of the projected testimony and its significance? Must he in some way validate the proposed testimony so as to give it some stamp of verity.[sic]
>
> (3) To what extent, and in what manner, must it be shown that if severance is granted there is likelihood that the codefendant will testify?
>
> (4) What are the demands of effective judicial administration and economy of judicial effort? Related to this is the matter of timeliness in raising the question of severance.
>
> (5) If a joint trial is held, how great is the probability that a codefendant will plead guilty at or immediately before trial and thereby prejudice the defendant, either by cross-defendant prejudice or by surprise as it relates to

5

trial preparation?

*Byrd*, 428 F.2d at 1019-20.

In the two decades of frequent appellate review that has followed *Byrd*, the original five areas of inquiry have been distilled into a two-part test, each part directing the trial court to weigh four factors. *See, e.g., United States v. Pepe*, 747 F.2d 632, 651 n.20 (11th Cir. 1984). The first part of that test determines if the defendant will be prejudiced if denied the co-defendant's proffered testimony. To satisfy this portion of the test, the defendant must demonstrate:

> (1) a bona fide need for the co-defendant's testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) the likelihood that the co-defendant will in fact testify if the cases are severed.

*United States v. DiBernardo*, 880 F.2d 1216, 1228 (11th Cir. 1989). *Accord United States v. Smith*, 918 F.2d 1551, 1560 (11th Cir. 1990); *United States v. Harris*, 908 F.2d 728, 739 (11th Cir. 1990); *United States v. Funt*, 896 F.2d 1288, 1297 (11th Cir. 1990); *United States v. Machado*, 804 F.2d 1537, 1544 (11th Cir. 1986); *United States v. Pruitt*, 763 F.2d 1256, 1263 (11th Cir. 1985); *United States v. Bovain*, 708 F.2d 606, 610 (11th Cir. 1983).

Once the defendant has satisfied the first part of this test, the court is to determine the propriety of severance by weighing four additional factors:

> (1) the significance of the testimony in relation to the [movant's theory of] defense[ ], (2) the extent of the prejudice caused by the absence of the testimony, (3) the effect of severance on judicial economy and the administration of justice, and (4) the timeliness of the motion.

*DiBernardo*, 880 F.2d at 1228. *Accord Smith*, 918 F.2d at 1561; *Harris*, 908 F.2d at 739; *Funt*, 896 F.2d at 1297; *Machado*, 804 F.2d at 1544; *Pruitt*, 763 F.2d at 1263; *Bovain*, 708 F.2d at 610; *DeSimone*, 660 F.2d at 540.

6

## Application of the *Byrd* Analysis to the Proposed Testimony of Joseph Russo

Joseph Russo's proposed testimony satisfies both parts of the two-fold *Byrd* analysis.

1. **The Importance Of Joseph Russo's Testimony: The First Four Factors**

    a. ***The Bona Fide Need For Joseph Russo's Testimony***

    If any one person is in a position to offer exculpatory testimony for Doreen Russo regarding the crimes charged, that person is her husband and co-defendant Joseph Russo. The government's theory of prosecution is the same as to both. According to the Second Superseding Indictment, they conspired and in fact laundered money by depositing and transferring funds, while knowing that they came from an unlawful source.

    As demonstrated by the Proffer of Counsel, Joseph Russo is the one person who can testify about Doreen Russo's lack of knowledge regarding the transactions involving these funds. Absent Joseph Russo's testimony, the jury may conclude that Doreen Russo must have known about the transactions and the source of the funds by virtue of the large sums, the fact that she executed the transactions, her husband's alleged involvement and her title as a corporate officer. Joseph Russo is the only person who can credibly explain that Doreen Russo knew nothing about investment fraud operations or any other illegal activity and, importantly, did not know the source of the funds in question. Because Joseph Russo and Doreen Russo are husband and wife, the likelihood of guilt by association is great. Absent testimony from Joseph Russo to the contrary, the jury may assume that he explained all to her in the confidence of their marriage. He did not and the jury should know that.

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

### b. *The Substance Of Joseph Russo's Testimony*

The Proffer of Counsel illustrates that Doreen Russo had a minimal role in Joseph Russo's endeavors, be they lawful or otherwise. Her name was associated with a corporate entity, yet she was involved in no substantive way. She was unfamiliar with his business and did not know the details about the transactions of which she became a part. In particular, Joseph Russo is the person best qualified to attest that Doreen Russo did not know the source of the money transacted. This is true regardless of whether or not **he** knew of the unlawful nature of the funds–as long as he did not tell Doreen Russo that the funds were tainted.

### c. *The Exculpatory Nature And Effect Of Joseph Russo's Testimony*

The exculpatory nature of Joseph Russo's testimony fairly leaps from the Proffer of Counsel. That testimony completely exonerates Doreen Russo of the conspiracy and substantive money laundering charges. According to the Proffer of Counsel, Doreen Russo knew nothing about any illegal origin of the money she transacted, let alone some investment fraud operation based in a condominium in Greenville, South Carolina. This testimony, if credited by the jury, means unequivocally that Doreen Russo is innocent and not guilty of the crimes alleged in the Superceding Indictment.

### d. *The Likelihood That Joseph Russo Will Testify At A Separate Trial*

In *Byrd*, the former Fifth Circuit said that severance may be denied where the likelihood that the co-defendant would testify is no more than "a gleam of possibility in the defendant's eye." 428 F.2d at 1022; *cf. United States v. Shuford*, 454 F.2d 772, 778 (4th Cir. 1971) (defendant must establish a "reasonable probability that the codefendant would testify). In the Proffer of Counsel, Joseph Russo's counsel indicates that Joseph Russo

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

will testify for his wife Doreen Russo if their trials are severed and his own trial goes first. This is the order of trials approved in *DiBernardo*. Thus, this factor weighs heavily in favor of severance.

### 2. Why Severance Is Appropriate: The Second Four Factors

The appropriateness of severance in this case is demonstrated by the significance of Joseph Russo's testimony, the extent to which the defense of Doreen Russo will be prejudiced if his testimony is lost, the timeliness of this motion, and by the minimal adverse impact a severance would have on the interests of judicial economy.

#### a. *The Significance Of Joseph Russo's Testimony To The Theory Of Defense of Doreen Russo*

As explained above, the government claims that Doreen Russo conspired to and in fact conducted financial transactions with money that she knew to be from an illegal source–i.e., an investment fraud operation in South Carolina. The defense of Doreen Russo is that she did not know anything about the money, much less that it came from an illegal source. *See* Exhibit A at 3 (Joseph Russo upon arrest stated that Doreen "knows nothing about money and that she wrote the checks because he told her to do so."). To think that this housewife of over 30 years is a keen money launderer is pure fantasy.

Joseph Russo's testimony directly contradicts the government's theory. What is more, it rebuts the inference of guilt created by her apparent association with his corporation and her status as his wife. Testimony that Doreen Russo had nothing to do with the nuts and bolts of Joseph Russo's business and knew nothing about criminally derived money would cause the government's case against her on all counts to fall like a

9

house of cards. Simply put, Doreen Russo's defense will rise or fall with her husband's testimony. That testimony, if accepted by the jury, should exculpate her completely. Moreover, that testimony is "peculiarly within the knowledge" of Joseph Russo. *See DiBernardo*, 880 F.2d at 1228.

### b.    The Extent Of Prejudice If Severance Is Denied

Because of the importance of Joseph Russo's testimony to Doreen Russo's defense, she will suffer acute prejudice if that testimony is lost as a result of the denial of a severance. The jury may assume that if her name was "on" the corporation and she was Joseph Russo's wife, she must have known where the money came from. Thus, when she conducted transactions--the reasoning goes--she was guilty of money laundering. It is not an oversimplification to say that Doreen Russo's defense will be made with Joseph Russo's testimony, but inadequate without it.

### c.    The Interests Of Judicial Economy

Where a severance motion is timely filed and the need for the co-defendant's testimony is compelling, the extent to which judicial economy can weigh against severance may properly be called into question. As the Eleventh Circuit has observed, "a motion to sever based on the need for exculpatory testimony of a co-defendant implicates the constitutional rights of the movant." *DiBernardo*, 880 F.2d at 1226. And considerations of judicial economy, although relevant, "cannot be elevated to the point where they impair a defendant's rights under the Constitution[.]" *Pepe*, 747 F.2d at 651; *DiBernardo*, 880 F.2d at 1228 ("[T]he teaching of *Byrd v. Wainwright* and its progeny is that judicial economy must yield to a defendant's right to a fair trial."). In this case, Doreen Russo's need for the exculpatory testimony of Joseph Russo outweighs the minimal adverse effect that

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

severance would have on judicial economy.

### d. *The Timeliness Of This Motion*

This motion is being filed well before the scheduled trial date and is timely. This motion is also being filed within the time period for pretrial motions set by this Court. The cases in which severance has been denied on timeliness grounds are those in which the defendant's motion was not made until <u>after</u> the trial had commenced. *See, e.g., United States v. Funt*, 896 F.2d 1288 (11th Cir. 1990) (motion made in seventh week of trial); *United States v. Perez*, 648 F.2d 219 (5th Cir. Unit B 1981) (motion made after government rested its case-in-chief). Thus, the timeliness of this motion weighs in favor of granting a severance in this case.

### CONCLUSION

For the foregoing reasons, defendant Doreen Russo respectfully requests entry of an Order severing her trial from the trial of Joseph Russo, and permitting her to be tried after Joseph Russo.

Respectfully submitted,

BLACK, SREBNICK & KORNSPAN, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
(305) 371-6421; Fax (305) 358-2006

For
By: _____
Howard M. Srebnick, Esq.
Fla Bar #919063

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on <u>December 4</u>, 2001 a true and correct copy of the foregoing was furnished by mail to:

Brian McCormick, Esq.
Assistant United States Attorney
500 East Broward Boulevard
7th Floor
Fort Lauderdale, Florida 33394-3002

Jayne Weintraub, Esq.
100 S.E. 2nd Street, Suite 3550
Miami, Florida 33131

John Howes, Esq.
633 S.E. 3rd Avenue, Suite 4F
Ft. Lauderdale, FL 33302

Ana M. Jones, Esq.
Bayside Plaza, Suite 625
330 Biscayne Boulevard
Miami, Florida 33132

Emmanuel Perez, Esq.
2121 Ponce de Leon Boulevard
Suite 290
Coral Gables, FL 33134-5222

Brian L. Tannebaum, Esq.
First Union Financial Center
200 South Biscayne Blvd., Suite 2690
Miami, Florida 33131

Jeffrey M. Harris, Esq.
One East Broward Boulevard
Suite 1500
Ft. Lauderdale, Florida 33301

Kenneth M. Swartz, Esq.
100 N. Biscayne Boulevard
21st Floor, New World Tower
Miami, Florida 33132

Philip R. Horowitz, Esq.
12651 S. Dixie Highway, Suite 328
Miami, Florida 33156

James Benjamin, Esq.
One Financial Plaza, Suite 1615
Ft. Lauderdale, FL 33394

Joseph S. Rosenbaum, Esq.
2400 South Dixie Highway, Suite 105
Miami, Florida 33133

David Tarlow, Esq.
801 Brickell Avenue, Suite 1901
Miami, Florida 33131-2900

Jon May, Esq.
200 East Broward Boulevard
Suite 1200
Ft. Lauderdale, FL 33301

David Rothman, Esq.
First Union Financial Center
200 South Biscayne Blvd.
Suite 2690
Miami, Florida 33131

By: _____
**HOWARD M. SREBNICK, ESQ.**
Attorney for Doreen Russo

BLACK, SREBNICK & KORNSPAN, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

Internal Revenue Service
Criminal Investigation

## Memorandum of Activity



| | | | |
|---|---|---|---|
| In Re: | JOSEPH RUSSO<br>650130159<br>DOREEN RUSSO<br>650130258 | Location: | 11255 SW 93rd Ct.<br>Miami, FL |
| Date: | August 21, 2001 | | |
| Time: | 7:05 AM (Approximately) | | |
| Participant(s): | JOSEPH RUSSO, Arrestee<br>DOREEN RUSSO, Arrestee<br>Ronald E. Wise, Special Agent, IRS<br>Celeste VanAuken, Special Agent, FBI<br>Kevin Rentzel, Special Agent, FBI<br>Willie Creech, Special Agent, FBI<br>Art Hopewell, Special Agent, FBI<br>Joe McMahon, Detective, Miami Dade Police Department | | |

On this date at approximately 6:30 AM, the arrest team met at a Publix parking lot at the intersection of SW 88th St. and 107th Ave., Miami, Florida. In addition to the above named individuals, two uniformed officers driving marked Miami Dade Police vehicles met with us to assist with the arrest.

At approximately 7:05 AM, the arrest team arrived at the RUSSO residence. As the team approached the front door, JOSEPH RUSSO opened the front door and advised us that he intended to cooperate with us. He then unlocked the gate to the courtyard which bordered the front door to the house and allowed us to enter.

Upon entering the house, I asked RUSSO if he remembered meeting me before, and he said that he did, and that he knew why we were there. He asked if we intended to arrest his wife, DOREEN in addition to him, and I told him that we had arrest warrants for both. He then called to DOREEN RUSSO who was outside on the patio beside the pool and asked her to come inside, explaining that the two of them were to be arrested by the FBI.

At approximately 7:10 AM, I advised JOSEPH RUSSO of his Statement of Rights (In Custody) be reading from Document 5661 (Rev. 8-82). RUSSO said that he understood these rights. He was allowed to telephone his daughter to ask her to come and secure the house and take care of the dog. Immediately following this conversation, Special Agent Hopewell and I escorted RUSSO to his bedroom where he was allowed to change clothes. After RUSSO had dressed, Agent Hopewell handcuffed and searched him. RUSSO was handcuffed using two pairs of handcuffs because he said he had a shoulder injury from playing basketball. He was handcuffed with his hands behind his back and the cuffs were checked for tightness and double

locked before he was escorted back to the foyer of the home.

During this time, Special Agents VanAuken and Creech were allowing DOREEN RUSSO to change clothes before being handcuffed.

As we were preparing to leave the residence, Special Agent VanAuken advised me that there was an attorney on the telephone with DOREEN RUSSO who wished to speak with me. I advised Special Agent VanAuken that I could not speak with the attorney at that time. Special Agent VanAuken told DOREEN RUSSO to advise the attorney that I could not speak with her and that the initial appearance would be in Miami, Florida before Judge Garber at 2:00 PM that day. Immediately thereafter, Special Agent VanAuken handcuffed DOREEN RUSSO. As we prepared to leave the house, JOSEPH RUSSO looked at his wife, DOREEN and apologized for "this," and DOREEN RUSSO told him that an apology was not necessary.

Before leaving the house, the back door was locked and shut, and the front door was closed. At approximately 7:30 AM, DOREEN RUSSO was placed in a vehicle with Special Agents VanAuken and Creech for transportation to the FBI office. JOSEPH RUSSO was placed in a vehicle with Special Agent Hartwell and me. Immediately upon entering the vehicle, JOSEPH RUSSO stated that his injured shoulder was giving him problems. He was allowed to get out of the vehicle before leaving his home, flex his shoulder, and then return to the vehicle where he was secured with a lap and shoulder belt and the door on his side of the vehicle was locked. The vehicles with JOSEPH RUSSO and DOREEN RUSSO left the RUSSO residence immediately after the RUSSO's were placed inside. The mileage on the vehicle which was driven by Special Agent Hopewell was 16,751.

At approximately 7:40 AM, I telephoned Assistant U. S. Attorney Brian McCormick and told him that the arrests had occurred without incident and that we were in route to the FBI office.

At approximately 8:20 AM, the vehicles containing JOSEPH and DOREEN RUSSO arrived at the N. Miami Beach FBI office where the RUSSO's were processed. The mileage on the vehicle was 16,776 at the time of arrival. JOSEPH RUSSO was offered a Waiver of Rights form which he declined to sign.

At approximately 9:45 AM, JOSEPH and DOREEN RUSSO were again handcuffed behind their backs for the trip to the U. S. Marshall's office in Miami, Florida. As before, two pairs of handcuffs were used for JOSEPH RUSSO and the cuffs were checked for tightness and double locked. JOSEPH RUSSO was transported in a vehicle with Special Agent Art Hopewell and me, while DOREEN RUSSO was transported in a vehicle with Special Agents Celeste VanAuken and Willie Creech. When Joseph Russo was first placed in the vehicle, I asked if his shoulder was still giving him problems, and he said he was fine. Before the trip began, he was secured with a lap and shoulder belt, and the door on his side of the vehicle was locked. The mileage on the vehicle was 16,776 at the time the time of departure.

At approximately 10:10 AM, both vehicles arrived at the U. S. Marshall's office in Miami. The mileage on the vehicle was 16,787 at the time of arrival. At the entrance ramp to the building, we were advised to place both prisoners in one vehicle due to limited parking space beneath the building. DOREEN RUSSO was placed in the front seat of the vehicle which had been used to transport JOSEPH RUSSO and they were taken into the parking area. They were then escorted

to an elevator where they were delivered to the U. S. Marshall's office by Special Agents Wise, VanAuken, Creech, and Hopewell.

During the ride to the FBI office and to the U. S. Marshall's office, I showed JOSEPH RUSSO a copy of the arrest warrant which described the charges which had been brought against him. He asked if the only evidence we had related to the purchase of the condominiums. I told him that we were also aware of the money he had received from and repaid to Frank DiCamillo. RUSSO explained that DiCamillo had sent him $100,000 to invest in the stock market. He said that he lost $14,000 of this money and that he felt so bad, that he returned the entire $14,000 to DiCamillo and absorbed the loss himself. He laughed that he had promised to pay DiCamillo interest on this $100,000 in the amount of $1,000 per month, and that he was amazed that DiCamillo wanted the interest even though he (RUSSO) had absorbed the $14,000 loss. He said that he believed that DiCamillo's money was clean, although he knows why DiCamillo is in prison.

He stated that he thought that DOREEN RUSSO had been indicted and arrested only as a tactic to force him to plead guilty to his charges. He said he knows that the routine will be that if he pleads guilty, she will go free. He added that she knows nothing about money, and that she wrote the checks because he told her to do so.

He said that he had originally hired the attorney who had been on the telephone with DOREEN RUSSO for himself, but he now believed that she would represent DOREEN RUSSO and he would hire another attorney.

He said that he believed the allegations about JOHN MAMONE being involved in book making, but he did not believe that MAMONE stole any money from elderly investors. I told him that MAMONE had taken many of the investor checks and negotiated them, and RUSSO explained that FRED MORGENSTERN had bounced many checks and owed MAMONE a lot of money. MAMONE had hired attorneys to try to collect this money but he had been unsuccessful. He believes that MAMONE was simply trying to collect the money he was owed by MORGENSTERN when he took this money.

I explained to RUSSO that the money that MAMONE sent to DOREEN RUSSO was derived from the investment checks which had been stolen. RUSSO countered that MAMONE owed him that money, and that the loan had been formalized with paper work including a note.

RUSSO said that from the time he was twelve years old, he followed horse racing, and that after his previous arrest, the judge prohibited him from going to the racetrack. I asked him if he knew anyone who would take his bets so that he did not need to go to the tracks, and he laughed and said "Yes, John."

RUSSO said that whatever happens, he will never talk about anyone else. He said that if

anyone stole money from elderly investors or got involved in telemarketing frauds, they should get into trouble. However, if drug dealers or Mafia people shoot each other, he was less concerned because they knew the risks when they got involved with those activities.

*Ronald E. Wise*
Ronald E. Wise
Special Agent

I prepared this memorandum on August 22 and 27, 2001, after refreshing my memory from notes made during and immediately after the arrests of JOSEPH and DOREEN RUSSO.

*Ronald E. Wise*
Ronald E. Wise
Special Agent